TARA K. McGRATH
United States Attorney
ALLISON B. MURRAY
Special Assistant U.S. Attorney
California Bar No. 328814
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9711
Email: Allison.Murray@usdoj.gov

Attorneys for United States of America

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-CR-0742-TWR |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| JORGE LUIS ESPINAL-PARRALES (5) | |
| Defendant. | |

The UNITED STATES OF AMERICA, by and through its counsel, United States Attorney, Tara K. McGrath, and Allison B. Murray, Special Assistant U.S. Attorney, hereby files this Sentencing Memorandum as to defendant Jorge Luis Espinal-Parrales (D5). This memorandum is based upon the files and records of the case.

**I.    INTRODUCTION**

After taking into consideration the seriousness of the offense, including the level of skill and preparation required to transport approximately 755 kilograms of cocaine on the high seas and the remaining 3553(a) factors, the United States recommends the Defendant be sentenced to 84 months custody, followed by 5 years of supervised release, no fine, and a $100 special assessment.

## II. STATEMENT OF THE CASE

Defendant Jorge Espinal-Parrales (D5) and co-defendants Levit Rivera Velazquez (D1), Irvin Ramos Ziga (D2), Eduardo Marin Herrera (D3), Luis Garcia Vera (D4), Agustin Noyola-Ricardez (D6), and Jorge Arcentales Castro (D7) are before the Court for sentencing after pleading guilty to possession of 5 kilograms or more of cocaine with intent to distribute on board a vessel and aiding and abetting in violation of 46 U.S.C. § 70503 and 18 U.S.C. § 2.

## III. STATEMENT OF FACTS



On April 8, 2023, a Maritime Patrol Aircraft detected a go-fast vessel on the high seas approximately 330 miles southwest of Acapulco, Mexico. The vessel was traveling at a high rate of speed with suspicious packages on deck and no indicia of nationality in a known drug trafficking area. United States Coast Guard Cutter ACTIVE, United States

Coast Guard Cutter BENJAMIN BOTTOMS, and HMCS EDMONTON (operating with an embarked United States Coast Guard Law Enforcement Detachment) were patrolling nearby and diverted for intercept. ACTIVE launched its assigned helicopter and BENJAMIN BOTTOMS launched a small boat with an embarked boarding team. Once on scene with the go-fast vessel, the Coast Guard helicopter crew ordered the vessel to stop, using its blue law enforcement light, verbal warnings, and warning shots, but the defendants failed to yield. Instead, for over forty minutes, covering approximately 21 nautical miles, the defendants used a series of corkscrew turns, changes in speed and direction, and even their own body parts to block the engines and prevent the Coast Guard gunner's safe use of disabling fire. During their evasion from law enforcement, the defendants jettisoned approximately 26 packages overboard. 14 of these packages, with a gross weight of 708.8 kilograms, were recovered from the ocean and confirmed to be cocaine. After an extended chase, the defendants finally came to a stop once disabling fire could be safely employed. In addition to jettisoning all of the cocaine overboard, the defendants also jettisoned electronic devices, including satellite phones and navigation equipment.





Defendant Levit Rivera Velazquez claimed to be the master or person in charge of the vessel and made a claim of Mexican registry. The United States implemented its bilateral agreement with Mexico and based on Mexico's response the vessel was treated as without nationality. The Coast Guard conducted a full law enforcement boarding.

Leading up to this point, defendant ESPINAL and co-defendants Luis Garcia Vera and Jorge Arcentales Castro departed the littorals near Manta, Ecuador on a cocaine-laden vessel equipped with sufficient food, supplies, and navigation equipment to make the long, arduous journey across the Eastern Pacific Ocean. Along the way, they completed at least three at-sea refuelings which required a fleet of vessels positioned in the middle of the ocean to receive them. The defendants coordinated with their receivers when they were in the vicinity. Once topped off with fuel, the defendants continued their at least 2,000 nautical mile voyage until they reached a receiving boat from Mexico. To journey this far requires a team effort. Every individual on board took turns operating the vessel, navigating, protecting the precious cargo, refueling as needed, and assisting in tasks to keep the high-speed vessel up and running.

Over a week into their journey, defendant ESPINAL and co-defendants Luis Garcia Vera and Jorge Arcentales Castro finally reached the "ilegada" or arrival point at sea, located hundreds of miles offshore of central Mexico. It is here that a second vessel, sent from the coastline of Oaxaca, Mexico, received them—a vessel embarked with co-defendants Levit Rivera Velazquez, Irvin Ramos Ziga, Eduardo Marin Herrera, and Agustin Noyola-Ricardez. Here the defendants completed an "at-sea" transfer of the cocaine, shifting the cocaine from the vessel from Ecuador to the vessel from Mexico. This at-sea transfer represents a critical point in maritime drug smuggling, where responsibility shifts from the cartel supplying the cocaine to the cartel receiving it. Once the cocaine and mariners from the first vessel were safely transferred over to the second, the vessel from Ecuador was sunk. The seven defendants proceeded together on a northeasterly course toward Mexico. Interdiction by the U.S. Coast Guard, however, cut their return trip short.

## IV. POINTS AND AUTHORITIES

### 1. Sentencing Guidelines

The United States submits that the following Guideline calculations apply:

| | | |
|---|---|---|
| A. | Base Offense Level [USSG §2D1.1(c)(1)] | 38 |
| B. | Safety Valve [USSG §2D1.1(b)(18)] | -2 |
| C. | Acceptance of Responsibility [USSG §3E1.1(b)] | -3 |
| D. | Adjustment for Certain Zero Point Offender [USSG § 4C1.1] | -2 |
| E. | Departure for Early Resolution/Appellate Wavier [USSG §5K3.1] | -3 |

**Final Offense Level** **28**

Criminal History Category:    I

Range:    78 - 97 months

The Court should decline to impose any further variance, as that would create an unwarranted sentencing disparity between similarly situated defendants and would not promote respect for the law.

### 2. Government Recommendation

The United States recommends an 84-month custodial sentence. Several factors justify the Government's recommendation. Contrary to defendant's assertions, he played no small part in the massively complex undertaking that is maritime cocaine smuggling in the Eastern Pacific Ocean. To transport over 700 kilograms of cocaine over 2,000 nautical miles on the high seas requires tremendous skill and experience in the marine environment. It is not a job for novices or those deemed untrustworthy by the drug trafficking organizations employing them. Like so many others, ESPINAL volunteered for the trip knowing of its financial reward. He was carefully vetted. In return for substantial efforts, maritime drug smugglers are handsomely compensated, typically paid thousands or tens of thousands of U.S. dollars.

The sophistication of carrying out the present offense similarly influences the Government's recommendation. Evidence of its complexity includes the route taken and the coordination and logistics required. Here, the defendant and two others traveled all the way from Ecuador across the Eastern Pacific Ocean to a location 300 nautical miles short of Mexico. Defendant's preparation, expertise, and efforts underway were critical. Defendant acted as more than a mere drug courier which this district often encounters for sentencing in land-based drug smuggling ventures. Instead, he possessed the specialized skills required for maritime smuggling. There is no dead weight on a boat. The defendant was hired because he had familiarity with the maritime environment and could be trusted to carry out the job. To suggest otherwise defies logic and common sense.

Moreover, the complexity of the voyage, commitment of the defendant in accepting the task at hand, and trust placed in him to protect what was surely more than the 14 bales of cocaine recovered favors a strong sentence. As evidenced by the final interdiction location, the defendant was prepared to be away for an extended period and helped navigate the vessel over a multi-day journey without a safe or reliable means of rescue. This was a well-coordinated and planned expedition. Indeed, simply packing sufficient food, supplies, and parts for repair requires considerable knowledge and foresight. Over

this journey, the defendant was required to deal with all the difficulties that navigation on the high seas brings, including weather, sea state, and difficult communications. This requires unique fortitude. This journey required him to be responsible for the cocaine for an extended period in both duration and geography. A prudent drug trafficking organization would not entrust more than 700 kilograms of precious cargo to an unskilled, untested, or coerced mariner. Nothing of the sort. Each kilogram is worth thousands of dollars.

Finally, the efforts to evade detection and spoliate evidence influence the United States' recommendation. Video footage shows the defendants working together to jettison at least 26 bales overboard during a 21 nautical mile chase. Only 14 bales were recovered from the ocean. The defendants' collective experience in maritime smuggling showed—if they blocked the engine with their own bodies, if they failed to give the Coast Guard gunner a clear shot, they would have enough time to jettison the cocaine overboard. They did. Had the defendants not engaged in their concerted effort to spoliate evidence, the facts of this case would be different. Even so, the astonishing volume of cocaine recovered represents a severe threat. Cocaine remains an extremely dangerous drug with the power to kill, especially as it is increasingly laced with the most dangerous drug, fentanyl. The volume of cocaine recovered is 142 times the amount required for a ten-year mandatory minimum sentence, and more than 50% more than the amount of cocaine that establishes the highest possible base offense level in the sentencing guidelines. Defendant ESPINAL's role in transporting the cocaine from Ecuador to Mexico was critical to advancing the goals of the drug trafficking organizations involved. During a maritime drug smuggling venture the value of the drugs, and potential profit, increases exponentially as it is transported from the littorals of South America north to Mexico and on to the United States. There is no doubt that if this highly dangerous drug successfully made it to the United States it would have caused extensive harm.

### 3. Safety Valve

Defendant ESPINAL has met the requirements for Safety Valve under USSG § 2D1.1(b)(18) and 5C1.2.

### 4. Role

The United States does not believe an adjustment for role, either aggravating or mitigating, is appropriate for Defendant ESPINAL. The defendant bears the burden of proving that he is entitled to a downward adjustment based on his role in the offense. *United States v. Dominguez-Caicedo*, 40 F.4th 938, 964-66 (9th Cir. 2022) (noting that the relevant comparators are the *actual* participants in the defendant's crime—not that of every hypothetical member of a typical drug trafficking organization). The defendants operated as a team, utilizing tremendous skill, training, and acumen as discussed. They took turns manning the helm for an extended 2,000 nautical mile journey. To put the distance into perspective, the defendant traveled nearly the greatest distance entirely within the contiguous United States (from the southernmost point in Florida to the northernmost point in Washington) *at sea*. He and co-defendants Arcentales-Castro and Garcia-Vera were literally stuck in the same boat, and all were critical and equally culpable for its voyage. ESPINAL is not less culpable than the average participant—let alone *substantially* less culpable.

Defendant also understood the scope of this crime: he was to travel across the Eastern Pacific Ocean, making periodic stops for fuel, until eventual rendezvous with another go-fast vessel from Mexico. Here, he would transfer the bulk cocaine to the vessel from Mexico and return to Mexico with the loot. He was involved in planning for and preparing for the criminal activity. He volunteered for the criminal activity. As a key crewmember on his go-fast vessel in the middle of the high seas, he was in control of the vessel and exercised independent decision-making authority. Finally, defendant stood to benefit from the criminal activity, expecting some financial or other reward. Indeed, maritime smuggling demands significant reward. Men like the defendant do not endure weeks at sea in a desolate

and dangerous ocean for free. Defendant ESPINAL participated in the criminal activity, stood to benefit from it, and exercised discretion in performing the acts to further the criminal enterprise. This weighs against a role reduction.

## V. CONCLUSION

An appropriate sentence in this case should reflect several key sentencing principles, including the serious societal harm of drug trafficking, the need to deter maritime smuggling in general, and specific deterrence to keep Defendant ESPINAL from reoffending. The incentive to make relatively large sums of money trafficking drugs—especially given the incredibly low odds of detection in the open ocean—must be balanced with significant sentences.

Based on the 3553(a) factors, a custodial sentence of 84 months, followed by 5 years' supervised release, no fine, and a $100 special assessment is appropriate.

DATED: December 8, 2023

Respectfully submitted,

TARA K. McGRATH
United States Attorney

*/s/ Allison B. Murray*
ALLISON B. MURRAY
Special Assistant U.S. Attorney