1  CHARLES L. REES
   California State Bar No. 200682
2  **LAW OFFICES OF CHARLES L. REES**
   424 F Street, Suite 205
3  San Diego, California 92101
   Telephone: (619) 239-9300
4  Facsimile: (619) 702-5415

5  Attorney for
   Jorge Arcentales Castro

6

7              UNITED STATES DISTRICT COURT

8              SOUTHERN DISTRICT OF CALIFORNIA

9              **(HONORABLE TODD W. ROBINSON)**

10

11 UNITED STATES OF AMERICA,        )  CASE NO.:  23CR742-TWR
                                    )
       Plaintiff,                   )
12                                  )  DATE:  January 19, 2024
   v.                               )  TIME:  9:30 a.m.
13                                  )
   JORGE ARCENTALES CASTRO,         )
14                                  )  **DEFENDANT'S SENTENCING
       Defendant.                   )  MEMORANDUM**
15                                  )
                                    )
16 ─────────────────────────────────

17 TO:  TARA K. MCGRATH, UNITED STATES ATTORNEY, and
        ALLISON B. MURRAY and SHAUNA R. PREWITT, ASSISTANT UNITED
18      STATES ATTORNEYS:

19
       The defendant, Jorge Arcentales Castro, by and through his attorney, Charles L.
20
   Rees, hereby files the following Sentencing Memorandum.
21
   //
22
   //
23
   //
24
   //
25
   //
26
   //
27
   //
28
                                                                    23CR742-TWR

# I.

# SENTENCING REQUEST

Jorge Arcentales Castro awaits sentencing for possessing cocaine with intent to distribute on board a maritime vessel in violation of 46 U.S.C. § 70503. He is one of seven defendants arrested by the United States Coast Guard ("USCG") on April 8, 2023, in international waters, approximately 330 miles south of Acapulco, Mexico. Their boat was spotted traveling at a high rate of speed in a known drug trafficking area by aircraft patrol. USCG Cutters and a USCG helicopter were deployed to intercept the boat. A chase ensued and shots were fired by the USCG in an attempt to disable the boat. Some of the other defendants on board threw packages from the boat overboard. The boat was eventually disabled and the USCG retrieved 14 packages containing 755 kilograms of cocaine from the water.

Mr. Arcentales immediately confessed his involvement to the USCG agents and was first to accept the Government's plea offer. At sentencing, the Government will recommend a sentence of 78 months. Probation will recommend 72 months.

Mr. Arcentales is a 37-year-old fisherman, husband, and father of two children. Like many from his small fishing village of Jaramijo, in the Manabí province of Ecuador, he has lived in poverty since he was a child. Before his arrest, he struggled to buy food for his family, pay for his son's school supplies, and could only provide shelter for his family by house-sitting for days or weeks at-a-time, uprooting his family and moving once the homeowner returned. His only source of income came from fishing. It is a job he has held since he dropped out of school in the 7th grade. A job that can earn him as much as $1,000 a month, but which usually earns much less. It is one of the few "good paying" jobs in Jaramijo available to someone with only a 7th grade education and limited ability to read and write. A job in which Mr. Arcentales and other fishermen from his village competed for work each day, walking the docks in search of someone who might hire them to go out to sea to fish for one or several days at a time. A job that compensates fishermen based on the quality and quantity of fish caught. An unsuccessful fishing trip, even one lasting

several days, usually results in no pay for the unlucky fishermen on board. It was his search for a fishing job that brought Mr. Arcentales into the instant offense. The job he actually received, however, was to smuggle drugs from Ecuador to Mexico. His decision to accept the job is one he deeply regrets.

As will be discussed herein, Mr. Arcentales's actions in this case do not reflect his true character. He remains a hardworking, loyal, and loving husband and father whose desire to provide for his family clouded his otherwise good judgement. At sentencing, counsel for Mr. Arcentales will request a sentence of 65 months' custody with two years' supervised release to follow. A sentence of 65 months is warranted for the reasons that follow.

## II.

## RELEVANT BACKGROUND

**1.    The Plea Agreement and Calculations**

On August 25, 2023, Mr. Arcentales entered a guilty plea to Count Two of the Indictment. His guilty plea was pursuant to a plea agreement (the "Agreement") containing the following terms:

| | |
|---|---|
| Base Offense Level | 38 |
| Safety-Valve | -2 |
| Acceptance of Responsibility | -3 |
| Early Disposition/Appellate Waiver | -3 |

[Agreement at p. 9.] The Agreement provides that if Mr. Arcentales is safety-valve eligible the Government will recommend a sentence of 84 months. [Id. at p. 11.] Following his guilty plea, AUSA Allison Murray and two agents met with Mr. Arcentales to determine his eligibility for safety-valve. The Government concluded Mr. Arcentales was truthful in his telling of the events surrounding his involvement in the instant offense and will, therefore, recommend a 2-level reduction for safety-valve. [Government Sentencing Summary Chart. ["Govt. SSC." at p. 2.]

Mr. Arcentales has no criminal history points and is in a Criminal History Category I. [PSR at ¶¶ 31-34.] The parties agree, therefore, that Mr. Arcentales is entitled to an additional 2-level adjustment under USSG § 4C1.1 pursuant to the 2023 amendment to the sentencing guidelines for "zero point" offenders. [Govt. SSC at p. 2.] At a resulting level 28 and a Criminal History Category I, his guideline range is 78-97 months.

**2.  Safety-Valve Information: Mr. Arcentales's Involvement**

The Government determined that Mr. Arcentales satisfied the requirements for safety-valve. [Government Sentencing Memorandum ("Govt. Sent. Memo") at p. 5.] Mr. Arcentales informed AUSA Murray and the agents that he did not initially intend to transport drugs on the high seas. Rather, he accepted what he believed to be an offer to fish out at sea for several days. Once he learned the true nature of the job, however, he did not back out and agreed to participate in the drug smuggling venture. He was primarily responsible for refueling the boat and maintaining the engines but also helped navigate the boat when the defendant with that primary responsibility needed to sleep. He was never informed how much money he would be paid and did not know exactly how he would return to Ecuador after reaching the final destination. Finally, he relayed that he and the other co-defendants from Ecuador did not participate in throwing the packages overboard as they were afraid of repercussions from the individuals behind this load.

**3.  The Sentencing Recommendations**

The Agreement contemplated a Government sentencing recommendation of 84 months. [Agreement at p. 11.] After reading the PSR, and in consideration of the fact that Mr. Arcentales was the first to plead guilty, the Government now recommends a sentence of 78 months under 18 U.S.C. § 3553(a). [Govt. Sent. Memo at p. 9.] Probation recommends a below guidelines sentence of 72 months with two years of supervised release to follow. [PSR at ¶ 85.] Probation makes its recommendation under § 3553(a) and cites the following factors in support: (1) Mr. Arcentales did not initially know the vessel contained drugs. [Id. at ¶ 75]; (2) Mr. Arcentales will be separated from his family for the entirety of his incarceration due to his family's inability to enter the United States. [Id. at ¶ 76]; (3)

1  Mr. Arcentales had a difficult childhood and struggled financially throughout his life,
2  including "being forced to drop out of school at a very young age to work as a fisherman"
3  to provide for his family. [Id. at ¶ 77,80]; (4) Mr. Arcentales has no history of violence or
4  substance abuse. [Id.]; (5) Mr. Arcentales expressed remorse for his involvement. [Id. at
5  ¶ 75]; and (6) Mr. Arcentales's incarceration will have a significant impact on him and his
6  family. [Id. at ¶ 81.]

### III.
### 18 U.S.C. § 3553(a)

Mr. Arcentales was born in Jaramijo, Ecuador where he lived with his parents and two siblings. [PSR at ¶ 36.] Although not reflected in the PSR, Mr. Arcentales cried while discussing his childhood. His father was physically abusive and beat both him and his mother regularly for several years. [Id. at ¶ 39.] Mr. Arcentales's abuse began when he was just 8 years old and continued for seven years until he was strong enough to fight back at the age of 15. [Id.] As a young child he also watched helplessly as his father beat his mother. His mother's beatings only stopped when he and his brother were able to intervene when they got older. [See id.] Despite the abuse, his mother stayed with Mr. Arcentales's father and continued to stay with him when he cheated on her and fathered a child with another woman. [Id.] In addition to the abuse he suffered as a child, Mr. Arcentales grew up in poverty. His father made little money as a fisherman and often couldn't afford to buy food for the family. [See id.] To help support the family, Mr. Arcentales dropped out of school in the 7th grade to work as a fisherman. [Id. at ¶ 56.] It is the only profession he has ever known. [See id.]

Mr. Arcentales has been married to Tatiana Mero for the last six years. Together they have two children: a 3 month old daughter who was born while Mr. Arcentales was in custody and a 16-year-old stepson. [Id. at ¶ 42.] Wanting to be a better father to his children than his own father, Mr. Arcentales worked hard to provide for his family. His work as a fisherman, however, was unreliable. While he could make up to $250 a week, there were many weeks he made nothing at all. [Id. at ¶ 59.] Mr. Arcentales stated during

his presentence interview that when it is "dark at sea" it is difficult to make a living and that the life of a fisherman often depends on "luck." [Id. at ¶ 15.] To provide a home for his family, Mr. Arcentales worked as a house-sitter at rental properties which allowed him and his family to live in the home he was watching until it was eventually rented out. [Id. at ¶ 41.] While this provided a roof over their heads, it required the family to move regularly. Mr. Arcentales also struggled to pay for basic necessities and often had to borrow money from friends to buy food for his family. [Id. at ¶ 15.] Shortly before his involvement in the instant offense, Mr. Arcentales was struggling to find a way to pay for his son's school exams. [Id.] It was under these circumstances that Mr. Arcentales regrettably made the decision not to back out of the drug smuggling venture. With his judgment clouded, Mr. Arcentales accepted the job, hoping the unknown amount of money he would be paid would allow him to pay for his son's school exams and allow him to find a permanent home for his family. [Id. at ¶ 80.] It is a decision he deeply regrets.

Mr. Arcentales became emotional while discussing his remorse and his separation from his family. [Id. at ¶ 16.] As the probation officer makes clear in his report, Mr. Arcentales is devoted to his family and his separation from them has been particularly devastating. Mr. Arcentales prided himself on being a good father to his wife and kids. Although he couldn't always provide for them financially, he provided them with the love and affection he never received as a child. He knows he has let his family down. Not just because he is separated from them as a result of his criminal activity, but because of the poor example he set by involving himself with drugs.

For the last several months, Mr. Arcentales has been planning for his future. He promised his wife he will never again work as a fisherman and has secured a job working for his cousin in construction. Additionally, he hopes to take advantage of the educational and vocational programs offered at FCI, Terminal Island so he can further improve his

ability to make a living in Ecuador.[1] Most importantly, Mr. Arcentales wants to return home to his family. To be with his wife, son, and a daughter he has not yet met. For all these reasons, and more to be discussed at sentencing, it is respectfully requested that the Court sentence Mr. Arcentales to 65 months in custody with two years of supervised release to follow.[2]

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

---

[1] As noted in the PSR, the interpreter stopped the interview and informed defense counsel and the probation officer that Mr. Arcentales "had difficulty tracking and comprehending questions." [PSR at ¶ 52.] Defense counsel is also aware that Mr. Arcentales is limited in his ability to read and write in his native language. The programs offered at FCI Terminal Island would provide Mr. Arcentales the opportunity to improve his reading and writing and perhaps learn a new vocation.

[2] No letters of support were submitted in this case due to Mr. Arcentales's family's difficulty in writing and sending letters to defense counsel. Even with the assistance of an interpreter, his family were unable to do so. In oral conversations, however, they expressed their love and support for Mr. Arcentales.

## IV.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court sentence Mr. Arcentales to 65 months' custody with two years' supervised release to follow.[3] Additionally, it is requested that the Court recommend placement at FCI, Terminal Island so Mr. Arcentales may benefit from the educational and vocational programs offered.

Dated: January 12, 2024

/s/ Charles L. Rees
CHARLES L. REES
Attorney for Jorge Arcentales Catro

---

[3] On October 26, 2023, defense counsel and interpreter Daniela Leyva met with Mr. Arcentales for the purpose of reviewing his PSR and the Standard Conditions of Supervised Release (the "Conditions"). Ms. Leyva read the Conditions to Mr. Arcentales, word-for-word, in the Spanish language. Defense counsel then explained and summarized the Conditions to Mr. Arcentales through Ms. Leyva. A copy of the Conditions in the Spanish language was provided to Mr. Arcentales on January 12, 2024.