GERARD J. WASSON
California Bar Number 166636
427 C Street, Suite 310
San Diego, California 92101
Telephone: (619) 232-0181
gerard.wasson@sbcglobal.net

Attorney for Luis Garcia Vera

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE TODD W. ROBINSON)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 23CR0742-04-TWR |
| Plaintiff, | Date: January 19, 2024<br>Time: 9:30 a.m. |
| v. | |
| LUIS ALFREDO GARCIA VERA, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| Defendant. | |

The defendant, Luis Alfredo Garcia Vera, by counsel, Gerard J. Wasson, per Local Rule 73.11 and 18 U.S.C. § 3553(f), submits this Sentencing Memorandum.

### I.
### SUMMARY SENTENCING RECOMMENDATIONS

Counsel for Mr. Garcia respectfully recommends 65-months custody.

### II.
### STATUTORY FACTORS UNDER 18 U.S.C. §3553

Under 18 U.S.C. § 3582(a) the court is directed to consider certain factors to determine the appropriate punishment, "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." Id. (Emphasis added). Under 18 U.S.C. § 3553(a) the Court is directed to "impose a sentence sufficient, but not greater than necessary to comply with purposes [of sentencing]." Taken together §§ 3582(a) and 3553(a) reflect a clear Congressional preference for the least possible sentence, and for appropriate alternatives to incarceration.

**A.    The Nature And Circumstances Of The Offense, and
The History And Characteristics Of the Offender (§ 3553(a)(1))**

    **1.  The Offense**

Luis Garcia Vera is a 37-year old, from a small coastal town in Ecuador, where he lives with his wife and two children. He has no prior involvement with any criminal activity. He has worked from a young age, primarily as a fisherman. He also drove a taxi. His involvement in the offense was predicated on conversing with one of his fares. Specifically, while conversing with the fare, Mr. Garcia discussed his financial difficulties, due particularly to his daughter's medical expenses. The fare - a local recruiter for drug smugglers, asked Mr. Garcia if he was interested in a job. They exchanged phone numbers.

The recruiter subsequently called Mr. Garcia and offered him a job. While no details were divulged, Mr. Garcia knew the job entailed transporting drugs. He was offered payment - half to be paid when he embarked (delivered to his home), and the other half to be paid upon return. However, neither he nor his family received any money. Days before the trip, Mr. Garcia received another call from the recruiter providing further information and instructions. He was picked-up by a car and driven a couple hours from his town. He was eventually taken to a boat, where he met the other two Ecuadoran co-defendants. Together they were provided instructions, and given a GPS device and satellite phone. Mr. Garcia and the other two did not know how to use the GPS - i.e. how to enter coordinates. The smugglers told them that the coordinates would be entered by others at each re-fueling point along the way. After embarking, they all took turns manning the helm, as well as other necessary tasks.

After refueling a few times, they eventually rendezvoused with another boat off the coast of Oaxaca, Mexico, where the drug packages were transferred. The Mexican crew allowed the Ecuadorans to board their boat because the Ecuadoran boat became unsafe. It was taking on too much water. Approximately 330 miles south of Acapulco, Mexico, their boat was spotted traveling at a high rate of speed by USCG aircraft patrol.

USCG Cutters and a USCG helicopter were deployed to intercept the boat. A chase ensued. The captain of the boat drove the vessel unsafely in a futile attempt to evade apprehension. During which some packages from the boat were thrown overboard. The Ecuadorans did not participate in throwing the packages overboard as they were afraid of repercussions from the individuals behind this load. The boat was eventually disabled, and all occupants arrested.

As Mr. Garcia explained to the probation officer, he "has no words" to describe the level of remorse he feels. He had never been involved in anything like this before. He was motivated by financial desperation. He was unable to pay for his daughter's medical expenses. He is fully aware that his terrible decision has only resulted in more family hardship. He has vowed to never partake in illegal activity again.

### 2. History and Characteristics of Mr. Garcia[1]

Luis Garcia is a 37-year old, soft-spoken, introverted man. He was raised primarily by his grandmother, after his parents separated. He had to leave school at age nine to work to help his grandmother financially, including at a bakery and a grocery store. At age 12, he began working as a fisherman. Remarkably, at age 21, he returned to school to complete elementary school. He is interested in furthering his education, to complete middle school, and/or vocational training in mechanics.

Mr. Garcia maintains a close relationship with his parents and five younger siblings - all law abiding citizens of Ecuador. He is blessed with strong family support. He and his wife and two daughters, ages 8 and 2.[2] His youngest daughter, Kiara suffers from anemia and sever allergies causing frequent skin infections. Mr. Garcia does not use illegal drugs or abuse alcohol. He has no tattoos. He has never engaged in any violent behavior. To the contrary, he is described by those who know him best as a humble,

---

[1] Luis Garcia's family data and circumstances, educational and employment histories, and health conditions, have all been accurately reflected by the PSR, at ¶¶ 42 - 68.

[2] See Exhibit A - Garcia Vera Family Photo.

considerate, hardworking, family-oriented man.[3] His family was shocked upon learning of his involvement in the offense, as it is out of character. Upon release, he will return to his home and family, obtain primary at a tuna factory, and once again be a productive law-abiding member of his community.

**B.         Advisory Sentencing Guidelines (§ 3553(a)(4) and (5))**

        **1. Jointly-Recommended Sentencing Guideline Calculations**

The parties agree with a base offense level 38, a two-level "safety valve" adjustment, a three-level adjustment for acceptance of responsibility, and a two-level "zero point offender" adjustment. The parties also jointly recommend a three-level downward departure for appellate waiver pursuant to USSG § 5K2.0.

        **2. No Captain / Pilot Enhancement**

The government recommends a +2 enhancement pursuant to § 2D1.1(b)(3). However, a § 2D1.1(b)(3) enhancement is both legally and factually inapplicable.

Under § 2D1.1(b)(3):

> If the defendant unlawfully imported or exported a controlled substance under circumstances in which ... (C) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance, increase by 2 levels.

Here, Mr. Garcia did not unlawfully import or export a controlled substance. He was arrested 330 miles south of Acapulco, Mexico. Accordingly, he was neither charged with, nor pled guilty to, importation. Therefore, by the plain reading of § 2D1.1(b)(3), it is not legally applicable.[4]

Moreover, a § 2D1.1(b)(3) enhancement is factually inapplicable, as the government accurately states that all three of the Ecuadorans were "equally culpable" for

---

[3] See Letters in Support of Defendant for Sentencing, filed under separate cover.

[4] The PSR in recommending a (b)(3) enhancement incorrectly starts that "GARCIA unlawfully imported a controlled substance." [PSR, ¶ 20]. Accordingly, Mr. Garcia objects to this erroneous fact and resulting legal conclusion. United States v. Jimenez, 258 F.3d 1120. 1124 (9th Cir. 2001), (failing to object to a presentence report's legal conclusions results in forfeiture, while failing to make a factual objection results in waiver).

its voyage.[5] The government accurately states that during the Ecuadoran leg of the trip, "[e]very individual on board took turns operating the vessel, navigating, protecting the precious cargo, refueling as needed, and assisted with tasks to keep the high-speed vessel up and running."[6] All three of the Ecuadorans were equal participants in the venture.

The government bases their enhancement recommendation primarily on the post-arrest statements of Mr. Espinal. His statements were patently incredible. He stated that for the approximate 2000 nautical mile journey, he was tasked with simply "looking out for law enforcement while Garcia was tasked with navigating by use of the GPS device."[7] His post-arrest statements are an obvious, ludicrous attempt at reducing his own culpability. He does not identify the pilot - because all three "on board took turns operating the vessel, navigating, ... and assisted with tasks."[8]

There is simply no evidence supporting the government's claim that Mr. Garcia had "enhanced skill" beyond the skill of Mr. Espinal and Mr. Arcentales. All three were life-long fisherman; they had equal skills. Mr. Garcia had no additional information or instructions - all three were instructed at the same time by the same individuals before embarking. Mr. Garcia had no more responsibility; nor offered more money than the other two. They each shared the same duties, same responsibilities, and were to be compensated approximately the same. Therefore, in addition to being legally inapplicable, a § 2D1.1(b)(3) enhancement is also factually inapplicable.

### 3. Downward Departure &/or Variance

Mr. Garcia's case presents a plethora of mitigation - a definite, atypical combination of factors that taken together warrant departure per § 5K2.0 and United States v. Cook, 938 F.2d 149 (9th Cir. 1991), or a variance under 18 U.S.C. § 3553.

---

[5] Government Sentencing Memorandums for Co-Defendant Arcentales [Doc. #159, p. 8], and Mr. Garcia [Doc. #157, p. 5].

[6] Government Sentencing Memorandum for Co-Defendant Espinal [Doc. #135, p 4].

[7] Report of Investigation by Special Agent Luis Corrales, 5/2/2023, page 2.

[8] Government Sentencing Memorandum for Co-Defendant Espinal [Doc. #135, p 4].

### (a). Appellate Waiver - Agreement to Forego Extensive Litigation

Mr. Garcia resolved the matter without the government having to litigate substantive motions. The Court is well aware that cases under the MDLEA raise several complex issues, including Rule 5 violations, motions addressing the conditions of the lengthy transport to the United States, motions to compel discovery (i.e. legality of the origins of the government's investigation),[9] the destruction of evidence, and dispositive motions such as challenging jurisdiction, venue, and the constitutionality of the MDLEA; see e.g., United States v. Davila-Reyes, 23 F. 4th 153 (1st Cir. 2022, opinion withdrawn pending rehearing *en banc*) (First Circuit held 46 U.S.C. § 70502(d)(1)(C) facially unconstitutional because the provision applies to vessels that are not "stateless" under customary international law and therefore exceeds Congress' authority under the Felonies Clause). Here, Mr. Garcia's agreement and fulfillment of the plea agreement, including his appellate waiver, has certainly resulted in a beneficial effect on the prosecutorial and judicial resources of the courts of this District.

### (b.) Family Responsibilities - Motivation for Offense Conduct

The "United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom." U.S. v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992) (13-level downward departure affirmed because sole responsibility of 4 young children is extraordinary family circumstance). Accordingly, family responsibilities are relevant to determining whether a sentence should be outside

---

[9] See *How a C.I.A. Coverup Targeted a Whistleblower*, The New Yorker, October 30, 2020, describing a scheme by the C.I.A. and the F.B.I. in which more than a hundred entries in the Helios database labeled as originating from the F.B.I. were actually from a secret C.I.A. surveillance program. "Searching Helios, [the whistleblower] ultimately found more than 100 entries aboard the deceptive labeling," in which "57 prosecutions had relied on these entries" and 19 resulted in criminal convictions. Id at 4. "In all of the cases, [U.S.C.G.] cutters, relying on information from Helio, had intercepted small vessels on the open waters of the Pacific. What was not disclosed in court proceedings was that "classified C.I.A. information had led the Coast Guard to the locations of the smugglers." Id. "In most of the cases… F.B.I. agents submitted affidavits attributing the arrest to *routine patrols*." The affidavits were "intentionally misleading, denying prosecutors the information they needed to properly meet discovery obligations, and undermining the resulting convictions." Id. Although the New Yorker article only covers cases from Florida, it reads as though it is describing the origins of the origins of this investigation: routine patrols in the Pacific Ocean miraculously finding small go-fast boats carrying fishermen from Central America with cocaine.

the applicable guideline range. § 5H1.6; see e.g., United States v. Pena, 930 F.2d 1486, 1494-95 (10th Cir. 1991)(affirming departure for defendant supported infant, and daughter with infant). Moreover, a defendant's motive for committing the offense is one important factor [in determining the sentence]. Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993). Motives are most relevant when the trial judge sets the defendant's sentence, and it is not uncommon for a defendant to receive a minimum sentence because he was acting with good motives, or a rather high sentence because of his bad motives.[10]

Family responsibilities prompted Mr. Garcia's involvement in the offense. His daughter's medical conditions required constant medication and treatment. Although working multiple jobs, he was still unable to afford the ensuing medical expenses. It was these pressures that motivated Mr. Garcia's agreement to become involved in the offense. Therefore, family circumstances and responsibilities - the sole motivation for the offense conduct, provides a basis for departure pursuant to § 5H1.6, in combination with other factors per § 5K2.0, or as a factor in variance.

### (c). Lack of Placement Options

Courts have found departure warranted based on the effect that a defendant's alienage has on custody and placement. In U.S. v. Cubillos, 91 F.3d 1342 (9th Cir. 1996), the Ninth Circuit remanded for further findings to determine whether departure was warranted on the basis of the effect that defendant's status as an alien has on Bureau of Prison custody. See also U.S. v. Davoudi, 172 F.3d 1130 (9th Cir.1999) (where defendant convicted of making false statements to bank, court had discretion to depart because deportable alien unable to take advantage of minimum security designation of the up-to six months of home confinement authorized by 18 U.S.C. §3624(c). Like the defendants in the above cases, Mr. Garcia is precluded from early release to a Residential Reentry Center and programs that could reduce time imprisoned - based entirely on his alienage.

///

---

1 W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b), p. 324 (1986).

**(d.) Collateral Consequences - Permanent Entry Preclusion**

There is a broad range of collateral consequences under federal law that attach upon a felony conviction. Based on this conviction, Mr. Garcia will lose the ability to obtain legal immigration status, denied United States citizenship, and admission into the United States. See e.g., Padilla v. Kentucky, 130 S.Ct. 1473, 1482 (2010) ("[D]eportation is an integral part – indeed, sometimes the most important part – of the penalty that may be imposed on non-citizen defendants who plead guilty to specified crimes.") Id. at 1483 (preserving the client's right to remain in the United States may be more important than any potential jail sentence citing INS v. St. Cyr, 533 US 289, 323 (2001)).

**(e.) Unlikeliness of Re-Offending**

Mr. Garcia is unlikely to ever re-offend. His time in custody in a foreign country where he never intended to be, especially during difficult conditions - without the possibility of any family visitation, has left an indelible mark on him. He is extremely remorseful. He has never been away from his family; he has never before been detained. Despite these difficult conditions, Mr. Garcia remains positive, has made productive use of his time in custody, and looks forward to the day when he can eventually reunite with his family. The likelihood that a defendant "will engage in future criminal conduct [is] a central factor that a district court must assess when imposing sentence." Pepper v. U.S., 131 S.Ct. 1229, 1242 (2011). Courts have found the unlikeliness of recidivism as a basis for downward departure. See e.g, U.S. v. Carter, 538 F.3d 784 (7th Cir. 2008)(departure from 87-108 months to 24 months was reasonable for 61-year old defendant in money laundering / tax fraud case because defendant's age is relevant to risk of recidivism); U.S. v. Smith, 2008 WL 1816564 (4th Cir. April 22, 2008)(departure from 78-97 months to 24 months not abuse of discretion where court noted among other factors that defendant had "an absence of risk that he will involve himself in similar conduct in the future").

Other factors supporting variance under § 3553(a) include:

(1) Mr. Garcia will be separated from his family for the entirety of his incarceration due to his family's inability to enter the United States;

(2) He had a difficult childhood and struggled financially - being forced to drop out of school at a very young age to work to help provide for his family;

(3) Mr. Garcia has no history of violence or substance abuse; has a good reputation in his community and continued strong family support;

(4) He has expressed expressed remorse for his involvement; and

(5) Mr. Garcia's lengthy incarceration will have a significant impact on him and his family.

In conclusion, a variant sentence of 65 months imprisonment is a significant sentence that fulfills the purposes of sentencing under §§ 3553(a)(2)(A) and (B). It balances the serious maritime nature of the offense with a significant amount of drugs involved, with the characteristics of the offender, reduces the risk of recidivism, affords adequate deterrence and rehabilitation. See e.g. United States v. Qualls, 373 F.Supp. 2d 873, 877 (E.D. Wis. 2005) (a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration).

## III.

## SENTENCING RECOMMENDATION

Based on all the above, with the factors set forth in 18 U.S.C. § 3553(a), Counsel for Mr. Garcia respectfully recommends a sentence of 65-months custody.

Dated: January 15, 2024

Respectfully submitted,
/s/ Gerard J. Wasson
GERARD J. WASSON
Attorney for Mr. Garcia Vera



